IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION


| | |
|---|---|
| LINDA DOWNS and )<br>R. ALLEN DOWNS, )<br> )<br>    Plaintiffs, )<br> )<br>    v. )<br> )<br>REGIONS BANK, )<br> )<br>    Defendant. ) | CIVIL ACTION NO.<br>2:08cv758-MHT<br>(WO) |

OPINION

Plaintiff Linda Downs filed this lawsuit claiming
that defendant Regions Bank violated federal law by
terminating her employment because of her gender and age
in violation of the Age Discrimination in Employment Act
of 1967 (ADEA), 29 U.S.C. §§ 621-634, and Title VII of
the Civil Rights Act of 1964 (Title VII), as amended, 42
U.S.C. §§ 1981a, 2000e to 2000e-17, and by invading her
financial privacy in violation of the Right to Financial
Privacy Act (RFPA), 12 U.S.C. §§ 3401-3422. Downs also
asserts various state-law claims, and her husband joins

this action to charge the bank with a state-law loss-of-consortium claim. Jurisdiction over Downs's federal claims is proper under 28 U.S.C. § 1331 (federal question); 29 U.S.C. § 626 (ADEA); 42 U.S.C. § 2000e-5(f)(3) (Title VII); and 12 U.S.C. § 3416 (RFPA); jurisdiction over Downs's and her husband's state-law claims is invoked pursuant to 28 U.S.C. § 1367 (supplemental).

This case is currently before the court on Regions's motion for summary judgment. Summary judgment will be granted in favor of the bank on Downs's federal claims, and her and her husband's state-law claims will be dismissed without prejudice.

## I. STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment

as a matter of law." Fed. R. Civ. P. 56(c)(2). In deciding whether summary judgment should be granted, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## II. BACKGROUND

Downs began working for Regions in 1982 as a teller. Three years later, the bank promoted her to financial-service representative (then known as customer-service representative), a position she served in until the bank terminated her on March 6, 2007, for allegedly "kiting" checks between her and her husband's two personal accounts.[1]

---

1. Downs defines check kiting as "using funds between different banks when the funds are not there." Pl.'s Resp. Mot. Summ. J. 7. A dictionary defines it as "The illegal practice of writing a check against a bank account with insufficient funds to cover the check, in
(continued...)

3

Downs and her husband had two joint checking accounts: one at Regions and another at Maxwell Federal Credit Union. Beginning in late January 2007 and continuing through February, Downs wrote a series of checks from her Regions account addressed to her husband, which she deposited for him in their Maxwell account. Each time Downs wrote her husband a check, he would on that same day or soon after write her a check from their Maxwell account for the same or similar amount of money, which she would then deposit in their Regions account.

---

1. (...continued)
the hope that the funds from a previously deposited check will reach the account before the bank debits the amount of the outstanding check." Black's Law Dictionary 253 (8th ed. 2004). At the time of Downs's termination, Regions did not define check kiting in its employee handbook. The handbook now contains the following definition: "Kiting can be defined as illegally benefitting from float; for example, by depositing and drawing checks between two or more banks." Def.'s Ex. A-9. "Float" is the time period after a check is deposited in one bank but before it clears the bank account from which it was written. See, e.g., Downs Dep. 55-56.

## A. Relevant Alleged Check-Kiting History[2]

| Date written (date deposited) | Check Writer (bank account drawn from) | Check Recipient (bank account deposited to) | Amount |
|---|---|---|---|
| 1/22/07 (1/23/07) | Linda Downs (Regions) | Allen Downs (Maxwell) | $ 300 |
| 1/23/07 (1/23/07) | Allen Downs (Maxwell) | Linda Downs (Regions) | $ 300 |
| 1/23/07 (1/24/07) | Linda Downs (Regions) | Allen Downs (Maxwell) | $ 500 |
| 1/24/07 (1/24/07) | Allen Downs (Maxwell) | Linda Downs (Regions) | $ 500 |
| 1/25/07 (1/26/07) | Linda Downs (Regions) | Allen Downs (Maxwell) | $ 500 |
| 1/26/07 (1/26/07) | Allen Downs (Maxwell) | Linda Downs (Regions) | $ 500 |
| 1/29/07 (1/30/07) | Linda Downs (Regions) | Allen Downs (Maxwell) | $ 425 |
| 1/30/07 (1/30/07) | Allen Downs (Maxwell) | Linda Downs (Regions) | $ 400 |
| 2/1/07 (2/1/07) | Allen Downs (Maxwell) | Linda Downs (Regions) | $ 400[3] |

2. Robert Young Dec. Ex. 2.

3. While Regions Bank Fraud Prevention Manager Robert Young states there are eight check kiting "cycles," the reciprocal deposit for this transaction, if there was one, does not appear in the evidence.

| | | | |
|---|---|---|---|
| 2/15/07 (2/15/07) | Allen Downs (Regions) | Cash (Allen Downs's Maxwell) | $ 1200 |
| 2/16/07 (2/16/07) | Allen Downs (Maxwell) | Linda Downs (Regions) | $ 1200 |
| 2/20/07 (2/22/07) | Allen Downs (Regions) | Cash (Regions)[4] | $ 1300 |
| 2/22/07 (N/A) | Linda Downs (Regions savings account cash withdrawal) | N/A | $ 1300 |
| 2/22/07 (2/23/07) | Allen Downs (Regions) | Cash (Regions) | $ 1100 |
| 2/23/07 (2/23/07) | Allen Downs (Maxwell) | Linda Downs (Regions) | $ 1100 |

## B. The Investigation

In late February 2007, Robert Young, Regions Bank Fraud Prevention Manager, received notification from a computer program that Downs was possibly kiting checks. After studying the deposit history between the Downs's Regions and Maxwell accounts, he generated a fraud-prevention report and photocopied the checks and relevant deposit slips from the transactions listed above. He

---

4. It appears that this deposit was made to the Downs's Regions "Christmas Club" saving account).

determined that there was evidence that Downs had engaged in check kiting. He then informed Bill Summers, a Regions Bank Corporate Security Investigator, of his findings.

Upon receiving Young's report, Summers began an investigation to determine if Downs was, in fact, kiting checks. Summers contacted Maxwell to ses if there were sufficient funds in the Maxwell account, and he determined that Downs was engaging in check kiting, though neither Regions nor Maxwell had lost any money as a result of her conduct.

On March 4, Summers met with Downs to discuss her recent account activity. He asked her if she was kiting checks, and she replied that she was not. After being shown the fraud-prevention report, Downs explained verbally and in writing that, because her husband is self-employed, she often would deposit checks for him. She would write a check from the Regions account and deposit in his account at Maxwell because she knew that

he would "give it back to [her] the next morning."
Def.'s Ex. B.  Downs wrote in her statement that "her
husband would call [her] at work and tell [her] to make
a deposit for him after work to cover his outstanding
checks."  Id.  Summers explained to Downs that he
believed her described conduct to be check kiting, which
Downs disputed because she never bounced a check or
maintained a negative balance in either checking account.

The next day, Summers and Sandra Gayden, a Regions
Bank Human Resources Manager, summoned Downs to the
Regions corporate office.  Summers and Gayden continued
questioning Downs about her checking-account activity and
asked her to add additional information to her statement
taken the previous day.  After the meeting, Gayden called
Downs and informed her that the bank was terminating her
employment because of check kiting.  She was replaced  by
Matt Darby, a younger male.

At the time Downs was terminated, the Regions
employee handbook stated that, "Reports of significant

financial irresponsibility, including but not limited to check kiting ... may result in discipline up to and including termination of your employment." Def.'s Ex. H. It is the bank's policy to terminate all employees who engage in check kiting. From 2005-2007, nine employees, including Downs, were terminated for check kiting. The eight employees fired aside from Downs were all under the age of 40. Eight of the nine fired, including Downs, were female. Andrea McCain Dec. 1-3.

During the time that Downs was terminated, Regions was in the process of merging with another financial institution and both companies were in the process of downsizing their workforces.

### III. DISCUSSION

#### A. ADEA Claim

Downs claims, under the ADEA, that Regions terminated her because of her age and in order to avoid paying her retirement benefits. The ADEA prohibits an employer from

9

discriminating against an employee because of that employee's age; the protected group under the ADEA includes employees over the age of 40, 29 U.S.C. § 621(a)(1), as Downs was at the time of her termination.

Downs attempts to survive summary judgment by making out an age-discrimination case under the burden-shifting analysis set forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973). <u>See</u> <u>Cofield v. Goldkist, Inc.</u>, 267 F.3d 1264, 1267 n.6 (11th Cir. 2001).[5] Under <u>McDonnell Douglas</u>, Downs must first demonstrate a prima-facie case of age discrimination. One method of demonstrating this is to show that: (1) she was a member of the protected

---

5. While the Supreme Court recently held that the text of the ADEA does not authorize a "mixed-motives" age-discrimination claim and that, "to establish a disparate-treatment claim under the plain language of the ADEA, a plaintiff must prove that age was the 'but-for' cause of the employer's adverse decision," the Court did not overturn the use of the evidentiary framework of <u>McDonnell Douglas</u> in the ADEA context. <u>See</u> <u>Gross v. FBL Financial Services, Inc.</u>, ___ U.S. ___, ___ n. 2, 129 S. Ct. 2343, 2349-50 n.2 (2009); <u>See</u> <u>also</u> <u>Smith v. City of Allentown</u>, ___ F.3d ___, ___, 2009 WL 4912120, at *5 (3d Cir. 2009) ("Gross ... does not forbid our adherence to precedent applying <u>McDonnell Douglas</u> to age discrimination claims.").

10

age group, (2) she was subjected to an adverse-employment decision, (3) she was qualified to do the job, and (4) she was replaced by a younger individual.  Chapman v. AI Transport, 229 F.3d 1012, 1024 (11th Cir. 2000).  Once she has satisfied this burden, a presumption of age discrimination arises.  The burden then shifts to Regions to rebut this presumption by articulating a legitimate, non-discriminatory reason for its employment action.  Id.  The bank has the burden of production, not of persuasion, and it is sufficient if its evidence explains Downs's termination in a manner legally sufficient to justify a judgment in its favor.  See Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253-55 (1981).

If Regions satisfies its burden of production, the presumption of discrimination is eliminated, and Downs must present evidence, which may include the previously produced evidence establishing the prima-facie case, to show by a preponderance of the evidence that the reason given by the bank was not the real reason for the

adverse-employment decision but rather a "pretext for discrimination." Burdine, 450 U.S. at 253. Downs may meet this burden by persuading the court that "age was the 'but-for' cause of [the bank's] adverse decision." Gross v. FBL Financial Services, Inc., ___ U.S. ____, ____, 129 S. Ct. 2343, 2350 (2009).

Downs has established a prima-facie case of age discrimination. She was over the age of 40 at the time of her termination, she was subjected to an adverse-employment action, she was qualified to do the job as a Regions employee in good-standing for over 24 years with strong performance reviews and no disciplinary record, and she was replaced by a younger individual. Chapman, 229 F.3d at 1024.

Because Downs has established a prima-facie case of age discrimination, the court turns its attention to whether Regions has articulated a legitimate, non-discriminatory reason for her firing. The bank asserts that Downs was fired because she was kiting

checks between her and her husband's personal checking accounts in violation of bank policy. As this is a legitimate and non-discriminatory reason to terminate an employee, Downs must demonstrate with evidence "that the reason[] given by [the bank] [was] not the real reason[] for the adverse employment decision." Id.

Downs argues that she was fired because of Regions merger with another bank. She explains that Regions and the other bank were reducing their collective workforce by "employees retiring, employees being laid off with severance pay, employees voluntarily resigning, and, as in this case, employees being terminated." Pl.'s Resp. Mot. Summ. J. 26. Downs posits that, as a part of the merger, Regions chose to terminate her because of her age and to deny her retirement benefits. Because Downs offers no evidence that the merger was the true reason for, or in anyway connected with, her firing, her statement amounts to nothing more than conjecture;

however, she claims that the bank's rationale must be pretextual as she believes that she was not check kiting.

Downs argues that she did not engage in check kiting because she never bounced a check and because, while the checks were "floating" between her and her husband's accounts, there was a positive balance in the accounts. Downs cannot prevail, however, for two reasons. First, she has failed to demonstrate that Regions treated any similarly situated employee accused of check kiting differently from the way she was treated. Second, Regions, has affirmatively shown that all nine employees found check kiting between 2005 and 2007 were terminated and that Downs was the only one of these nine over the age of 40.[6] See, e.g., Penn v. Dep't of Corr., 411 F. Supp. 2d 1326, 1332-35 (M.D. Ala. 2005) (Thompson, J.). In other words, not only has Downs failed to point to any evidence, circumstantial or otherwise, from which an

_____

6. One Regions employee was retained after being accused of check kiting when video evidence proved that the employee's check book was stolen and used by a family member. Gayden Dec. 4.

14

inference of age discrimination could be drawn, the bank has affirmatively shown that it did not discriminate because of age in dealing with those who were accused of or engaged in check kiting.

To be sure, Downs contends that she did not engage in check kiting. But whether her conduct is labeled check kiting and regardless as to whether the banks lost any money, Downs has failed to demonstrate that Regions treated any employee accused of similar <u>conduct</u> differently from the way she was treated, and the bank has affirmatively shown that all employees who were accused of such <u>conduct</u> between 2005 and 2007 were terminated. How her conduct is labeled makes no difference.[7]

---

7. In her affidavit, Downs asserts that she "ran into Bill Summers after [her] termination and he told [her] that he did not believe that what Regions did was right, that others had done far worse and were not fired and to call him if [she] needed a witness one day." Downs Aff 4. Downs presents no evidence of others committing worse acts at Regions with less discipline and Summers has offered a sworn declaration on behalf of Regions stating that he believes Downs was check kiting.

At bottom, all Downs has done is "quarrel with the wisdom of [Regions's] reason," <u>Chapman</u>, 229 F.3d at 1030, and attempted to show that Regions was mistaken in its conclusion that she was kiting checks. However, "[a]n employer who fires an employee under the mistaken but honest impression that the employee violated a work rule is not liable for discriminatory conduct." <u>Damon v. Fleming Supermarkets of Florida, Inc.</u>, 196 F.3d 1354, 1363 n.3 (11th Cir. 1999). Regardless as to whether Regions was mistaken in its definition of check kiting or how it labeled Downs's conduct, there is simply no evidence of disparate treatment here.

Therefore, summary judgment will be granted in favor of Regions on Downs's age-discrimination claim.

## B. Title VII Claim

Downs's Title VII claim is identical to her ADEA claim, but she replaces age with gender as the

discriminatory purpose for Regions's adverse-employment decision.

Downs establishes a prima-face case for gender discrimination under Title VII: (1) she is a member of a protected class (in this case, female), (2) she was subjected to an adverse-employment action, (3) she was qualified to do the job, and (4) she was replaced by a male. See Evans v. Alabama Dept. of Corrections, 418 F. Supp. 2d 1271, 1280 (M.D. Ala. 2005) (Thompson, J.). However, she has failed to demonstrate, as with regards to her ADEA claim, that the bank's reason for terminating her (check kiting) was a pretext for gender discrimination. She has failed to come forward with any similarly situated male employee who was treated differently from the way she was treated, and Regions has affirmatively demonstrated that it applies its check kiting policy in a non-discriminatory manner to both males and females.

Therefore, summary judgment will be granted in favor of Regions on Downs's gender-discrimination claim.

## C. RFPA Claim

Downs argues that Regions invaded her financial privacy in violation of the RFPA. In her brief, Downs cites to 15 U.S.C. § 6801-6810 as the RFPA. This is actually the citation for the Gramm-Leach-Bliley Act (GLBA), which requires, among other things, that financial institutions establish privacy policies and ensure costumers are aware of the privacy policies in place. Downs has no viable claims against Regions under the GLBA, as, pursuant to 15 U.S.C. § 6805, "[n]o private right of action exists for an alleged violation of the GLBA." Dunmire v. Morgan Stanley, 475 F.3d 956, 960 (8th Cir. 2007). In any event, at the pre-trial conference for this case, Downs's counsel acknowledged that she was not relying on the GLBA but rather was relying on the RFPA, 12 U.S.C. § 3401-3422, and specifically 12 U.S.C.

§ 3403(a) and <u>Chao v. Community Trust Co.</u>, 474 F.3d 75 (3d Cir. 2007), in crafting Downs's claim.

Downs's right-to-financial-privacy claim fails under the RFPA. She is correct that the RFPA prohibits unauthorized access into financial records; however, she overlooks that the RFPA is designed to regulate the federal government's access to a customer's bank records and does not regulate disclosure to entities other than the government. The RFPA provides:

> "No financial institution, or officer, employees, or agent of a financial institution, may provide to any Government authority access to or copies of, or the information contained in, the financial records of any customer except in accordance with the provisions of this chapter."

12 U.S.C. § 3403(a). Under the RFPA, "'Government authority' means any agency or department of the United States, or any officer, employee, or agent thereof." 12 U.S.C. § 3401(3).

The case Downs cites to support her position, <u>Chao v. Community Trust Co.</u>, 474 F.3d 75, 78 (3d Cir. 2007),

19

involves the Department of Labor's attempt to investigate a violation of the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001-1461. Regions, unlike the Department of Labor, is a private financial institution, and thus is not a "Government authority." Because Downs does not assert that Regions disclosed her financial records to any government authority, her claim under the RFPA must fail.

Therefore, summary judgment will be granted in favor of Regions on Downs's right-to-financial-privacy claim.

## D. State-Law Claims

This court "may decline to exercise supplemental jurisdiction over a claim if ... [it] has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). Because summary judgment will be granted on Downs's ADEA, Title VII, and RFPA claims, the court declines to exercise supplemental jurisdiction over both her and her husband's state-law claims against

Regions.[8] Accordingly, the state-law claims will be dismissed, albeit without prejudice. <u>See</u> <u>United Mine Workers of Am. v. Gibbs</u>, 383 U.S. 715, 726-27 (1966); <u>L.S.T., Inc. v. Crow</u>, 49 F.3d 679, 685 (11th Cir. 1995). Pursuant to 28 U.S.C. § 1367(d), the applicable statute of limitations under state law will be tolled 30 days so as to allow Downs and her husband time to refile their claims in state court.

* * *

For the foregoing reasons, summary judgment will be granted in favor of Regions and against Downs on all of Downs's federal claims, and her and her husband's state-law claims will be dismissed without prejudice.

An appropriate judgment will be entered.

DONE, this the 25th day of January, 2010.

            /s/ Myron H. Thompson     
            UNITED STATES DISTRICT JUDGE

---

8. Downs charges Regions with violating Alabama's Age Discrimination in Employment Act, 1975 Ala. Code § 25-1-20 to -29, libel, slander, defamation of character, intentional infliction of emotional distress, and false imprisonment.